**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

October 25, 2019

**BY ECF AND HAND DELIVERY**

Honorable Vincent L. Briccetti
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

     **Re:**   **United States v. Manish Kalra,**
            **19 Cr. 90 (VB)**

Dear Judge Briccetti:

     Manish Kalra is a gentle, soft-spoken, 21-year-old Indian man with no criminal history. He is deeply remorseful for his money-laundering offense, as he expresses in his own words in his letter to Court. **Exhibit A** (Letter of Manish Kalra). Under all of the circumstances of this case, and particularly in light of Mr. Kalra's youth and because this is his first offense, a below-Guidelines sentence of one year and one day is sufficient.

## BACKGROUND

     Mr. Kalra had recently turned 20 years old when he engaged in the offense conduct in this case. He was born in northeast India in 1998. His parents, Kishore and Sangita Kalra, have submitted letters to this Court, as have his sister, Manika, and several other family members and friends. See **Exhibits B–H** (Letters of Support). They describe him as "gentle," "kind," and "soft spoken." He "respects elders" and "trusts his friends." He has long had an interest and aptitude in cooking, so after high school he enrolled at the International Institute of Hotel Management ("IIHM") in Kolkata for a three-year culinary degree.

     As part of his studies, Mr. Kalra was selected to participate in an exchange program to the United States during his second year. He came on a J-1 exchange visitor visa in the summer of 2018 to train and cook at the West Hills Country Club in Middletown, New York. He was working there at the time of his arrest in November 2018.

Honorable Vincent L. Briccetti                    October 25, 2019
United States District Judge                              Page 2

After Mr. Kalra was selected for the exchange but before he left, a couple of older students in his college befriended him.  They said they had been to the United States before and could give him help and advice about how to make his way there.  Mr. Kalra had never been to the United States before, and he knew no one here.  They told him to think of them as brothers.  After Mr. Kalra arrived, one of them called him and asked him how much he had to pay for a taxi from JFK airport to Middletown.  When Mr. Kalra told him it was $300, his "older brother" asked him if he wanted to make money to cover such expenses.  Mr. Kalra said yes.

At the instruction of his "older brothers" in India, Mr. Kalra opened up several bank accounts.  As alleged in the Complaint, these bank accounts then received transfers of money, which Mr. Kalra wired on into different accounts as directed and withdrew funds to transfer to the men in India by Western Union.  Mr. Kalra knew nothing of the sophisticated fraud scheme by which these funds were obtained.  His role was to transmit the money through his bank accounts—opened in his own name—at the direction of others.  Although he did not know at the outset that he was doing anything illegal, he came to understand that something was wrong and knew he was breaking the law when a bank closed his account for fraud.

The government has extracted and translated text messages and What's App messages from Mr. Kalra's phone.  They reveal that three individuals directed his every move.  Mr. Kalra refers to them as "elder brother" in Hindi, and they tell him exactly what to do.  At times, Mr. Kalra appears to hesitate; their responses are by turns reassuring and threatening.

After one of Mr. Kalra's bank accounts was closed, his "friends" in India told him that he owed them the money that had been in that account.  They threatened him with consequences when he returned to India and told him he had to keep doing what they told him with the bank accounts in order to work off the loss.

Mr. Kalra regrets that he continued to receive and transmit money even after he learned that the money was fraudulently obtained.  Altogether, this offense involved $204,075.  But Mr. Kalra's share was much less.  He spent (or sent to his family) around $16,000–17,000.  The rest went others.

Mr. Kalra deeply regrets his actions.  He gave a detailed post-arrest statement and signed search and seizure waiver forms.  He agreed to the filing of an information, and pled guilty.  He has written a letter to the Court expressing his remorse.  He writes: "I want to send a sincer apology to the victim's and their family's. . . . I made a mistake without thinking what they need money for and made anybody fell nervous or helpless. . . . I know I have

Honorable Vincent L. Briccetti                    October 25, 2019
United States District Judge                                Page 3

hurt many people In the moment that bought us all here today."  Ex. A at 1
(sic).

## ARGUMENT

In selecting a sentence, this Court takes as its "lodestar the parsimony
clause of 18 U.S.C. § 3553(a)."  United States v. Douglas, 713 F.3d 694, 700
(2d Cir. 2013).  That provision directs sentencing courts to "'impose a
sentence sufficient, but not greater than necessary, to comply with' the
factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence,
incapacitation, and rehabilitation."  Id.; see also, e.g., United States v.
Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).  "[D]istrict courts may
impose sentences within statutory limits based on appropriate consideration
of all the factors listed in § 3553(a)."  Pepper v. United States, 562 U.S. 476,
490 (2011).  To be sure, the Guidelines range is one such factor, but it is only
one, and "the Sentencing Guidelines are just that, guidelines, and . . . 'they
truly are advisory.'"  Douglas, 713 F.3d at 700 (quoting United States v.
Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)).  This Court "may not
presume that the Guidelines range is reasonable," but rather "must make an
individualized assessment based on the facts presented."  Gall v. United
States, 552 U.S. 38, 50 (2007); see also Nelson v. United States, 555 U.S. 350,
352 (2009).

Here, the advisory Guidelines range is not a reliable guidepost for the
appropriate sentence to impose on Mr. Kalra.  After weighing the § 3553(a)
factors, especially Mr. Kalra's age and lack of criminal history, this Court
should impose a sentence of one year and one day.

**I.**      **The fraud guideline is not entitled to deference and will not
         lead the Court to a just sentence in this case.**

Mr. Kalra does not dispute that the Guidelines range is 21–27 months,
based on a loss amount of $204,075.  But the Guidelines are merely advisory
and the Court may not presume that they are reasonable in a given case.  See
Gall, 552 U.S. at 50.  Here, the applicable guideline does not merit deference
and will not guide the Court in determining a just sentence in this case.
Rather, as the Second Circuit recognized in United States v. Algahaim, 842
F.3d 796 (2d Cir. 2016), the fraud guideline's overwhelming focus on the loss
amount should lead courts to consider non-Guidelines sentences.  Id. at 800;
see also United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006)
(noting the "utter travesty of justice that sometimes results from the
guidelines' fetish with abstract arithmetic, as well as the harm that

Honorable Vincent L. Briccetti                              October 25, 2019
United States District Judge                                          Page 4

guidelines calculations can visit on human beings if not cabined by common sense"), aff'd, 301 Fed. Appx. 93 (2d Cir. 2008).

In considering the weight to be afforded to the Sentencing Guidelines in a particular case, in Kimbrough v. United States, 128 S. Ct. 558 (2007), the Supreme Court effectively recognized that not all guidelines are equal:  while some "exemplify the Commission's exercise of its characteristic institutional role," others do not.  Id. at 575.  In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case."  Id.

In Rita v. United States, 551 U.S. 338 (2007), the Court reasoned that if a particular guideline was originally based on past sentencing practices, and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of §3553(a).  Id. at 349.  Conversely, when a guideline is not developed according to this practice, there is less reason to believe that it embodies the statutory objectives and deserves deference, even in a mine-run case. Kimbrough, 552 U.S. at 109.

Section §2B1.1 is not based on historical sentencing practices or research, but rather is singularly focused on the overall loss amount, which is a poor measure of culpability.  As the Second Circuit recently explained,

> the Commission could have approached monetary offenses quite differently.  For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss.  Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range.  This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.

Algahaim, 842 F.3d at 800.  The Second Circuit has invited District Courts to consider non-Guidelines sentences in fraud cases for this reason.  Id. ("Where

the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."); see also, e.g., United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (describing how the fraud guideline effectively ignores everything but the loss amount and that many of the resulting Guidelines-recommended sentences are "irrational on their face"); United States v. Ovid, 09 Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (criticizing § 2B1.1).

More generally, the history of §2B1.1 shows the fraud guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrent efficacy or any other variable relevant to the purposes of sentencing.  It was not even originally intended as a codification of past sentencing practices.  To the contrary, it was written with the goal of increasing the severity of sentences over historic levels.  See United States v. Corsey, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.  As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.").

In light of the criticism surrounding the fraud guideline, it is not surprising that statistics provided by the Sentencing Commission find that that courts most often give below-Guidelines sentences in fraud cases. Excluding cooperators, courts in this district gave below-Guidelines sentences in 65% of fraud cases in fiscal year 2018.  See U.S. Sentencing Commission Statistical Information Packet for Fiscal Year 2018, Southern District of New York at Table 10.[1]  Including cooperators, the figure is 69%.  Id.

In this case, the Guidelines' overemphasis on loss is particularly inappropriate, since Mr. Kalra received only a fraction of the money taken.

## II.   __One year and one day is the appropriate sentence.__

One year and one day of imprisonment is a sufficient sentence under 18 U.S.C. § 3553(a).

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/nys18.pdf

Honorable Vincent L. Briccetti                    October 25, 2019
United States District Judge                                Page 6

### A.    The nature and circumstances of the offense are mitigated.

Mr. Kalra's offense conduct is serious but not unmitigated.  He did not engage in the underlying fraud; his role was to engage in monetary transactions.  He made each transaction at the instruction of others in the conspiracy; they directed his actions in detail.  That Mr. Kalra used bank accounts opened in his own name demonstrates his lack of criminal sophistication.  That he gained only a small percentage of the loss amount demonstrates his subordinate role.

Perhaps most importantly, Mr. Kalra is sincerely remorseful for his offense.  He understands that people were hurt by his conduct.  He writes: "If I could go back in time I would change so many things, but we all know that's not possible.  I accept full responsibility for the crime I committed which led to my arrest.  I hope and pray that these selfish action[s] don't define the rest of my life."  Ex. A at 1.

### B.    Mr. Kalra's youth is mitigating.

Mr. Kalra's crime need not define the rest of his life.  He was just 20 years old when he committed this offense.  His age is important for two interconnected reasons:  first, young people are less culpable because their judgment and impulse control are not as developed as an older person's; and, second, young people have a far greater capacity for change.  Graham v. Florida, 560 U.S. 48, 68, 74 (2010) (explaining that youth have "lessened culpability" and greater "capacity to change"); see also Roper v. Simmonds, 543 U.S. 551, 569 (2012) (explaining that young people are more vulnerable to negative influences and peer pressure, and it is more likely that their deficiencies will be reformed).

Over the last decade or so, a growing body of research "has demonstrated that adolescence is a period of continued brain growth and change. . . . The frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." See Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009;[2] Miller v. Alabama, 132 S. Ct. 2455, 2465 n.5 (2012) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning

---

[2] Available at the US Nat'l Library of Medicine, Nat'l Inst. of Health, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

Honorable Vincent L. Briccetti                          October 25, 2019
United States District Judge                                      Page 7

ahead, and risk avoidance.") (quoting brief for Lawrence Aber et al. as <u>Amici</u>
<u>Curiae</u>).

      The age of 18 is not a magic cut-off point for brain development.
"Immaturity at the time of the offense conduct is not an inconsequential
consideration.  Recent studies on the development of the human brain
conclude that the human brain development may not become complete until
the age of twenty-five . . . . [A recent National Institute of Health report]
confirms that there is no bold line demarcating at what age a person reaches
full maturity.  While age does not excuse behavior, a sentencing court should
account for age when inquiring into the conduct of a defendant." <u>Gall</u>, 552
U.S. at 58 (quoting lower court's reasonable determination that a
probationary sentence was warranted for a young defendant).

      As the Supreme Court has repeatedly recognized, the criminal justice
system should consider the "mitigating qualities of youth," including such
"hallmark features" as immaturity, impetuosity, and failure to appreciate
risks and consequences." <u>See</u> <u>Miller</u>, 132 S. Ct. at 2467, 2468.  This does not
mean that Mr. Kalra is not responsible for his conduct.  It does mean, though,
that his youth should lessen the severity of punishment, and that, in
fashioning a sentence, the Court can focus more on his capacity for change
(<u>i.e.</u>, on rehabilitation), than on punishment or incapacitation.

      Mr. Kalra has taken steps to improve himself in prison.  He works as a
block trustee and has found meaning in religious practice.  But
"imprisonment is not an appropriate means of promoting correction and
rehabilitation."  18 U.S.C. § 3582(a).

    **C.**    **Mr. Kalra's first-time-offender status is mitigating.**

      Before this case, Mr. Kalra had never been arrested before.  Now he is
imprisoned far from his home in India.  Unable until recently to get a call
with his family, his only contact with home was by letter.

      Courts have recognized that prison has a greater significance for those
who have served little or no prison time in the past, and that that should be
taken into account at sentencing.  <u>See</u> <u>United States v. Mishoe</u>, 241 F.3d 214,
220 (2d Cir. 2001) (recognizing in the context of the career offender guideline
that the amount of prior prison time is relevant to determining the deterrent
effect of the sentence to be imposed); <u>see also</u>, <u>e.g.</u>, <u>United States v. Baker</u>,
445 F.3d 987, 992 (7th Cir. 2006) (affirming below-Guidelines sentence on
government's appeal, and approving of "the district court's finding that a
prison term would mean more to Mr. Baker than to a defendant who
previously had been imprisoned") (citing § 3553(a)(2)(A)–(B)); <u>United States</u>

Honorable Vincent L. Briccetti                              October 25, 2019
United States District Judge                                        Page 8

v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser
prison term is sufficient to deter one who has not been subject to prior
lengthy incarceration than is necessary to deter a defendant who has already
served serious time yet continues to re-offend.").

        The time that Mr. Kalra has spent at the Westchester County Jail has
been immeasurably harder for him than it might be for an older individual
with prior prison experience and social visitors.  "In deciding what sentence
will be 'sufficient, but not greater than necessary' to further the goals of
punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity
of spirit, that compassion which causes one to know what it is like to be in
trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017)
(second internal quotation marks omitted).  The Court should take into
account the especial hardship of imprisonment in America for Mr. Kalra in
determining the appropriate sentence.  It should also consider that Mr. Kalra
will not be released after he completes his criminal sentence; he will spend at
least several weeks in immigration detention pending removal to India.

                            **CONCLUSION**

        Under all of the circumstances, one year and one day of imprisonment
is sufficient to comply with the purposes of sentencing in this case, and any
longer sentence would be greater than necessary to impose on this 20-year-
old first-time offender for his role in this nonviolent offense.  Cf. 28 U.S.C.
§ 994(j) (directing that alternatives to incarceration are generally appropriate
for first offenders not convicted of a violent or otherwise serious offense).


                                Respectfully submitted,

                                _/s/_____
                                Clay H. Kaminsky
                                Assistant Federal Defender
                                Federal Defenders of New York
                                (212) 417-8749


CC:    AUSA James Ligtenberg
       Manish Kalra

# EXHIBIT A

Dear Judge,
                    Briccetti
I want to send a sincer apology to the victim's and their family's. My intention was not to cause harm to the victim's I made a misteke without thinking what they need money for and made anybody fell nervous or helpless I am sorry if they felt scared or fell taken advantage of I also want to apology to my Mother Father & Family I know I have hurt many people In the moument that bought us all here today I've drawn myself closer to God and gain more wissome I'm fully aware that the actions I commited and change the lourse of my future & peoples future If I could go back in time I would change so many things, but we all know that's not possible I accept full responsibility for the crime I commited which lead to my arrest I hope and pray that these selfish action don't define the rest of my life I already being using my time incarcerated to better my self minds, body & soul while in Jail I'm working as my block trusty to make my own money I Go for my religious practice 5y times a week and to plan my future so that I don't have to be in the same situation again and I understood better whom to trust & belive in future I would like to be around Good & sucessful people in life I focus on my Goal for future because am worthy more than just a number & checks It does not end here my desires to become what God has plan for me will be accomplished Since I'm here I realise how life could be outside if I have never been on this wrong path even through I didn't understand

at the begning that what I was doing was wrong and I should have stoped when I understood it and I'm sorry for what I did I promise to redeem myself and allow my creator to use me as a force for good ness from here on out

Thank you Honer

Manish Kalra

# EXHIBIT B

Dear Judge Briccetti,

I am Kishore, Manish's father. How are you? I am writing this letter on our 25th wedding anniversary. Manish had plans for making his mother happy on this day. I am a bit introvert person so don't express my feelings much to his Mom but Manish made sure that his mom is happy whatever the day it is. He used to help his mom in household chores and when her mom isn't well he was the one who used to cook for everybody in the house. I am a diabetic patient and has regular joint pains but Manish used to give massage daily before going to bed so that I can sleep well. He used to get the groceries weekly and respected elders a lot. He greeted everyone with a smile. Whenever some guests come to us he used to sit with the guests and chat and he will take care of the food and drinks. When he used to go to his grandfather's place he used to make food for the whole family and share his recipes. He helps the grandmother in cooking. Grandfather has to park his bike daily inside at night so when he was there he used to do this daily at night for him and even takes it out early morning. This way the neighbors aren't disturbed with this and his grandfather can take it to work with no issues. My son is a gentle person. He is very helpful and a caring son. We all are here waiting for him to come back soon and complete his studies and then open his restraunt what he always dreamt of. Please send him I will be really grateful to you.

Kishore kalra

# EXHIBIT C

To Judge

Hello I am Sangita Kalra, Manish's mother. I don't know what to say. My son is such a sweetheart. I miss him a lot and how he took care of everybody in the family. I miss those days when he used to help me in the kitchen with everything and taught me so many new recipes. no one else is interested in cooking and won't help me with this but Manish was my savior when guests used to come. He used to make everything and doesn't let me help. I remember he told me maa you just sit and chat and enjoy and I will do everything no worries.

I used to tell him first think about yourself and then others but for Manish others comes first. I remember when his papa scolded Manish because some of his friends used to take advantage of his kindness and won't help him when he need it. Manish was always ready to help them even when they didn't have such good heart. He believed in people and wouldnt think about himself. When I talked with Manish on video I understood that he has become very much mature after this incident and now he understands how this world is and what is right and wrong. I know Manish has changed a lot and became more patient and isn't childish anymore. This is a good thing and made him a more better person. Manish listen to his friends too much but now he sees friends are not always right. He knows he need to think of everyone and the right thing. He promises he won't make the mistake again and I know he is truthful.


Sangita Kalra

# EXHIBIT D

Dear Judge Briccetti,

I am Manika, Manish's sister. How are you? I am writing this letter on rakshabandhan which is a Hindu festival we celebrate every year. It is about how the brother will protect the sister forever. I used to tie the Rakhi, the knot of protection, on Manish's wrist this day every year and he promised me to protect me. I wish he was here today

His habit of making others laugh even in worst situations was the best. Manish is a kind caring person who always tries to help. Manish is the life of this family who kept everyone happy by your behavior. In 12th grade when I didn't do so well on the college entrance exams the situation wasn't so good. Manish was so understanding that when papa didn't understand my problems. He gave me strength that this is not the end and I can do better in future. He is the one who gave me hope when I thought of giving up when everybody in the family was upset with my results. He made them understand and convinced them to give me another chance and I will do well. I got into college at SRM University and recently completed my post-graduation studies in forensic studies at Jain University. Manish is my support system without him I should not have completed my graduation.

Before college we went to boarding school together starting in 8th grade though I am older and it was separated by boys and girls. When he first started at school he was very small and would get picked on. Still he made friends and did a lot for school, but he always knew he loved cooking and wanted to do that and restaurant management. When I fractured my leg and couldn't attend classes for a month. He used to help in making notes for me and would get them from my friends. He helped me study and stay on track. The school was very far from home but we got a month off every year and we would both go home to Barbil. Because school was so long and far it was hard for us to spend time together as a family, but on breaks we did. . He loves cooking so he would cook something everyday something new. He taught us how to make pasta. He loves Chinese food – he

knows very well how to make it. The whole family used to eat it. When he went to college we would speak once a week. We talked about studies and parents and future plans.

Manish always trusts his friends. He would get mingled with everyone and spent a lot of time with friends after boarding school. When he lived in a hostel at the beginning of college he gave money to a friend so he could pay his monthly rent which was due. My dad got a call about the hostel fees because Manish didn't paid his own fees yet. Manish always wanted to help and did what his friends wanted.

I hope Manish comes back soon so he can complete his studies for a better future. I know he was as plan. He has family to stay with who can support him. He wrote me a letter that he wants to continue his education to pursue his dream. Eventually he wants to open a restaurant in Banglore which is where I live. It's like the Silicone Valley of India. There is a lot of opportunity here. We feel so helpless with him being far away. He has already missed many birthdays and holidays.

Manika Kalra

# EXHIBIT E

Dear judge Briccetti,

How are you? I am Rinku, Manish's Uncle. I am his mother's brother. I not always live close but am close with Manish. I remember when I came to Barbil for some work and stayed at his home Manish was so happy to share his room with me. He welcome me and share his space with no bitterness. When I used to get late at night from work he was the only one who waited for me to come back so that we can have dinner together. We would talk and eat. He shows me so much love and kindness. When  my financial condition was so down and I didn't had even proper clothes to wear he was the one who shared even his clothes with me and used to help me as much as he can. He used to give his pocket money to me so that I can get fill my bike's tank. I  was so embarrassed to ask for money or any help to his mom Or dad but he was the one who was more like a friend to me and helped me as much as he can. He also helped me emotionally when I got emotionally breakdown he was the one who made me laugh. Manish made me believe that it's not over yet and there is much in life. I was so depressed about my life but Manish made sure to make me feel positive about life. I almost gave up thinking that I cant do anything in life but Manish made me understand in a friendly caring way that everything is going to be fine and just have patience. I want to tell him the same.

Sir, I please request you to send Manish back home. I would be really grateful to you as he had already missed many things in life. It has been so hard for him and us with him so far and unable to lend the positive support he always gave. He can complete his degree course and make a better future for him and he has family support who wants him to complete his education.

RINKU ARORA

# EXHIBIT F

Hello Sir

I am Nitu, manish's aunt his mothers sister. Sir I wanted to tell you about Manish and his habit of helping others like he helped his cousins in their studies he is older than them. I have 2 children one is 14 year old and    other is 16. He is so patient and nice with them. In the summer they get many homework to do for school. Manish always help them with everything the science, math, and social studies. Even the big projects he do it with them the whole time. Manish is also nice with me. I went through a time when I am not financially well. I was tensed as we dont own a home     and keep on shifting because of landlords. Manish always comforted me and said he will always help in making my kids settled in life. He was a kid and gave such a big hope to me.   He told me not to worry everything will be fine and he will help me with this too. He reminds me what is most important for family to be there. Whether it is about the support or his positive attitude about life that gave me strength to fight against all the obstacles in life. I know he will be able to fight all obstacles in his life too. He got off his path but does not mean he is lost forever.. His naana and naani misses him a lot and my children we all do. We will all help Manish be better like he helps us. Thank you sir.


Nitu Munjal

# EXHIBIT G

Hi Sir - my name is Prince and wanted to request you to kindly send home Manish as soon as possible. You might be thinking who is this guy so Sir i'm his friend and its been really a long time since we've been friends. He is a very kind and gentle person. From the heart he always helps others.

I met him around 4 years back when we both were traveling in the same train. I was very tensed as was going to a new place but he helped me out by comforting me and from their onwards our friendship bloomed. He was always there when i needed him in every ups and down to support me as a friend. Even though there were times when we quarelled still he was always standing and supporting me. I will do the same for him and support him now when he needs it most. He deserves it because he is a good person. He always used to respect elders and is a very soft spoken person. He always tends to see the positive in each person and wants to believe in them. At every situation or crossroads he has hope which helps us to motivate and thus made us even close friends.


manish is not perfect. Their are times when a person is misleaded or commit some mistakes but that's what makes us humans rather than being a god. This is no little mistake and it was very wrong. Manish always learns from his past mistake making him a more better person. This is a trait which i personally liked in him. I know he will learn. I want to help him like he helps me so he does not do anything like it again. I would request you to please send him home as early as possible as thier are a lot of us waiting for him eagerly.


Prince Sharma

# EXHIBIT H

Dear Judge :

I am Lokesh Karnam and I am Manish friend. I met Manish in 2017 in college though we do not belong to the same department. I study hotel management but we all take the service department and then go to industry training after. In the beginning we had many of the classes together. Many of the lectures and seminars we used to go same time and travel together. He was a fantastic chef and would help me with the food production classes because I was not good like him in that area. We lived in a hostel together for 1.5 years. We lived in the same room with 3-4 people. There were 65 hostel members and 15-20 of us in groups. Manish would tutor everyone in the group because he was smart at classes. His cooking and food were always the best. Manish has been such a good hearted friend who always use to help others and take care of everyone in the hostel. After joining he has most of the skills in the department. He never said no to anyone would always say yes to anyone. Anytime we needed him he was there. We knew it very well that he would never say no, it's not in his nature. Even when he didn't know how to do it he would be there.

He was like a small brother for me. I have been to his home many times, met mother and father. I visited before he the industry training and we had lunch. We all do industry training in our college and was so excited. He always motivated us as a career because he was so in love with it. Manish was so good in school he went to New York. The college director decide who can go so only two or three people. I did it in India itself in a hotel. After he went over there we had less time to talk with working and time difference. Still we would have a word monthly. Recently I have not been able to speak with him because of the case. I don't have a single idea how to speak to him being in a different country.  I wish deeply to speak with him .

We miss Manish a lot. The Manish who always used to smile and help others before thinking anything about himself. I pray everything will be fine and I wish and I pray that he should come back to home and start with him new life. He's golden hearted guy. I wish he come back to India as soon as possible.


Lokesh Rao